At this term Stephen H. Costen, a Justice of the Peace of the county, was indicted and tried for the murder in the first degree, of Charles W. Woolsey, a public school-teacher, in the town of Christiana, on the night of the fourth day of the present month.
The parties were both bachelors and had been intimate friends up to the evening just mentioned. They were together at King's hotel in the village that evening, where they were joined by the two most material witnesses in *Page 341 
the case, Lemuel Butler before nine o'clock, and William T. Cann about ten, who testified that Costen drank three times while he was there and was then intoxicated, but Woolsey apparently not so. They all four remained there till about twelve o'clock and left together for their several homes. After they got out and started, Costen said to them he was going then to have some supper and wanted some beef, and they all went round to Cann's slaughterhouse and got some, and then went with it to Costen's house, where he at once went to work to have the supper prepared. Another person joined them on their way to Costen's house by the name of Rickards, and when they took their seats at the table, Costen and Woolsey did not, but remained on their feet attending to the cooking and waiting on the table, until they were about done when they also took seats at the table; and Butler testified that when he left there about three o'clock in the morning nothing unpleasant had occurred up to that time, and Costen and Woolsey were then sitting at the table together, Costen at the head of it and Woolsey at the side of it, and Cann lying on a lounge in the same room.
Cann testified that Costen, Woolsey and he sat down to the table together and ate supper, and immediately afterwards between half past 1 and 2 o'clock he laid down on a lounge in the room and soon fell asleep, and when he awoke Costen and Woolsey were both on their feet moving around the table, Costen away from Woolsey, and just then he saw Costen pick up a carving knife from the table and stretching it out in his hand with the point towards Woolsey, heard him say, "Woolsey, if you come at me again, f will give you this," when Woolsey advanced a step or two towards him and was then three or four feet from him, saying to him as he stepped forward he did not care a d___n for him or his knife either. As he advanced Costen stepped from the room through the open door into the passage, and he then could not see him, but in a moment or in not more than a minute after he left the room, or more than a minute from the time he awoke *Page 342 
and first saw them moving around the table, a shot gun was fired from the passage into the room, by whom he could not see, and Woolsey fell to the floor near the lounge on which he still was, and so near to it that he had to step over his body when he arose from it. The whole charge had entered his left breast. But he neither saw the gun when it was taken up in the passage, nor when it was fired. It was very quick after Costen's going out of the room into the passage that it was fired. As he passed out of the room he heard Woolsey say to him, "you son of a bitch, I have taken your abuse long enough!" As soon as Woolsey fell, Costen reappeared at the door and said to him to catch the artery and stop the blood, and that was the only thing he then said, and soon after the witness left the house for a doctor, and on returning with him in about fifteen minutes afterwards, he pronounced Woolsey dead and he then heard Costen say that he did not intend to kill him, but shot to take his arm off, for he, Woolsey, had stabbed him in the back, and that he felt the blood running from the wound down his back when he went out of the room into the passage. When he awoke, Woolsey was very near his head as he lay upon the lounge, and as he was moving around the table after Costen, neither of his arms were raised, but both of his hands were down by his side, and he saw no knife or weapon of any kind in his hands.
The Doctor testified that when he reached the house he found Costen sitting on the steps at the door of it talking to himself incoherently, and when he pronounced Woolsey dead he enquired of him if he was dead, and got him to examine a fresh cut wound in his back, which he found to be on probing, an inch and three-quarters in depth and three quarters in width. Costen's own knife which he produced was not sufficient to make it, but a knife afterwards found in the inside coat pocket of Woolsey he found would have made such a wound, and would also have made the cut over the wound in the coat of Costen. *Page 343 
It was further proved that Costen was a sportsman and kept a bird gun and frequently left it standing loaded in his passage and other places about his house, and that it was so charged on the occasion in question.
There was a coroner's inquest and a post mortem examination of the deceased, showing that the wound was not only mortal, but that death was almost instantaneous, and before which the prisoner made a voluntary confession in due form, setting forth the facts as already substantially detailed in the evidence, and declaring that his only intention was to shoot off or disable the right arm of the deceased, and not to kill him, which the State offered and read in evidence.
Homicide is the killing of any human being. It is of three kinds, known to the law.
First, as justifiable, being such as is committed from unavoidable necessity; as where an officer executes a criminal by command, and in strict conformity to the requirements of the law in every particular, or where the killing is for the advancement of public justice; as where an officer in the due execution of his office kills a person who assaults and forcibly or violently resists him; or, if a felon flee from justice and in pursuit he be killed where he cannot otherwise be taken. Or where the killing is for the prevention of any atrocious crime attempted to be committed by force; such as murder, robbery, housebreaking in the night time, rape, mayhem or any other act of felony against the person. But in all such cases, *Page 345 
the attempt must be not merely suspected, but clearly apparent and the danger must be imminent, and the opposing or resisting force must be clearly necessary to avert the threatened danger or to defeat the attempted felony.
Second. Excusable Homicide. 1st. By misadventure, as where a person doing a lawful act unfortunately kills another: as if he be at work with a hatchet and the hatchet accidentally flies off and kills a bystander; and so, in other like cases. 2ndly. Killing in self-defense which is where one is assaulted upon a sudden affray and in the defense of his person where certain and immediate suffering would be the consequence of waiting for the assistance of the law and there existed no other probable means of escaping impending death or enormous bodily harm, he kills his assailant. But to reduce the killing in self-defense to this degree and thus to make it excusable, it must be shown by the evidence that the slayer was closely pressed by his assailant and retreated as far as he conveniently or safely could in good faith, and with an honest intent to avoid the violence of the assault. And the jury must be satisfied from the evidence that unless he had killed his assailant, he was in imminent and manifest danger either of losing his own life, or of suffering enormous bodily harm. I have called your attention to the laws of justifiable and excusable homicide because of the very erroneous notions prevailing in the community on this subject, and not because there exists any necessity in this particular case for my doing so. The 3d kind of homicide is felonious, and is either murder or manslaughter, and if murder, it is either murder in the first or second degree; if in the first degree, the crime is punishable with death; if of the second degree, by fine, pillory, whipping and imprisonment for life.
Murder may be defined or described as the unlawful killing of a human being under the peace of the State with malice aforethought, either expressed or implied. It must be committed by a person of sound memory and discretion. It must be an unlawful killing, not excusable *Page 346 
or justifiable, and the killing must be committed with malice aforethought either express or implied. Malice as an ingredient in the crime is the essential criterion by which murder is distinguished from manslaughter. Wherever malice is the moving cause of the act committed which results in death, the crime amounts to murder. Malice in its legal sense, the sense in which it is used in respect to the crime of murder, is more comprehensive than mere personal hatred or malevolence towards individuals. For whilst it includes hatred it also comprehends and characterizes all acts committed with an evil disposition, all wrongful acts injurious to another done intentionally without just cause or excuse, all acts done from an unlawful and wrongful motive. Malice therefore according to its legal signification may be said to characterize all acts done voluntarily and with a wilfull disregard of the rights or safety of others. Where the act of killing is committed with express malice it is murder in the first degree. Express malice is where one person kills another with a sedate, deliberate mind and formed design, which formed design may be variously manifested, as for instance, by laying in wait, by former menaces or threats disclosing a disposition or purpose to commit the act charged, former grudges, former ill-will, secret enmity, hatred or sullen malevolence towards the deceased; or in fact by any other circumstances which disclose an evil or wrongful intention or purpose of the accused towards the deceased. Killing with express malice as I have said, constitutes murder in the first degree. Implied or constructive malice is an inference or conclusion of law from facts proved. It is implied by law from every deliberate, cruel act committed by one person against another, however sudden the act may be. For common sense teaches us that whoever voluntarily or willfully does a wrongful and injurious act against another does it maliciously.
The intention to kill is the grand characteristic which distinguishes murder in the first degree from murder in the second degree. Wherever therefore there is a design *Page 347 
or intention deliberately formed in the mind to take life, and death ensues in consequence of such design or intention, it is murder with express malice, and consequently murder in the first degree. The act of violence therefore from which death has ensued, in order to amount to murder in the first degree must be done deliberately with express malice, of the existence of which malice the design or intention to take life is the evidence. Murder in the second degree is where the malice necessary to constitute it, is implied by law. And malice, is implied by law from any deliberate, cruel act committed by one person against another, however sudden. While therefore there exists no design or intention to take life, but death ensues from an unlawful act of violence on the part of the slayer, and in the absence of adequate or sufficient provocation, it is murder with or by implied malice, and consequently murder in the second degree. I have said that the act of violence charged as causing death, in order to amount to the crime of murder, must be committed with a "deliberate mind and formed design." Certainly this is a just, and at the same time, a humane provision of the law. Deliberately and willfully doing an unlawful or wrongful act of violence without just cause or excuse, indicates the existence of malice in the perpetrator, and where death ensues from such an act, malice makes it murder.
It is especially necessary, therefore, to enable you to properly discharge your duty as jurors, that you should comprehend and understand the legal significance of the terms "deliberate mind, and formed design." Now, no specific length of time is necessary to make an act a deliberate act, in legal contemplation. A deliberate act may be very sudden. It does not so much import in its legal acceptation, an act done after time for reflection, as a voluntary act done upon motive of purpose and design, in contradistinction to acts done in the heat of passion, a paroxysm of resentment, in which reason and choice for the moment have lost their controlling influence. The *Page 348 
very definition of murder with implied malice shows that this is the legal signification of the term "deliberate," when used in this connection. Malice is implied by law from any deliberate, cruel act committed by one person against another, however sudden. Such is the explicit and uniform declaration of the law upon this subject. Your own experience and observation, gentlemen, must have taught you that the most sudden and instantaneous act may be attended with circumstances which leave no doubt on the mind that it was the result of deliberation. Indeed, we are left in no uncertainty in regard to the legal meaning of the term "deliberate," for it is well settled in the law both in this country and in England, that if the design to take life be but the conception and intention of a moment, it is as deliberate in legal contemplation as if it had been the design of hours, and that if the person killing had time for reflection or thought and did not think, and did then intend to kill and death ensued from his act of violence, it is just as much a case willful, deliberate, premeditated killing, as if he had intended it for hours. The intention to take life may be shown by a variety of external circumstances surrounding or connected with the fact of killing; such for instance as the declarations of the slayer; the mode or manner of killing, the character of the instrument used as a deadly weapon, or weapon likely to produce death, as well as by the manner in which the weapon was used by the slayer. All instruments likely to take life are deadly weapons. A gun is emphatically a deadly weapon.
Now gentlemen, it is my duty to say to you that it is a well-settled rule of law of universal application, the wisdom of which will be recognized upon a moment's reflection, that every man is presumed to contemplate and intend the ordinary and natural consequences of his own voluntary act. If the act thus voluntarily and willfully done has a direct tendency to destroy the life of another, the natural conclusion from the fact is, that he intended to destroy such a person's life so that if a person voluntarily *Page 349 
discharges the contents of a loaded gun against the person of another, the presumption is that he intended to kill him. As a general rule, all homicide, all killing of a human being is presumed to be malicious, and of course amounts to murder until the contrary appears; and therefore, it is incumbent upon the accused to make out by proof to the satisfaction of the jury, all such circumstances of alleviation, mitigation, extenuation, justification or excuse as may be relied on as matter of defense, unless such proof arises out of the evidence produced against him. It follows, therefore, that the presumption of malice arising from the fact of killing may be rebutted, overborne and displaced by showing circumstances of alleviation, mitigation, extenuation, justification or excuse. Now, gentlemen, you will bear in mind that what I have said in regard to deliberation, formed design, and intention to kill, have exclusive reference to the fact of malice, either expressed or implied, the existence of which is absolutely necessary to constitute the crime of murder.
But there is another crime of a lower grade, called manslaughter, to which I now wish to call your attention, and in doing so, I shall endeavor to enable you to understand in what respect it differs from the crime of murder, whether of the first or second degree. Murder results from and is attributable to pre-conceived malignity of heart, but voluntary manslaughter on the other hand is solely imputable to human frailty, the act of killing proceeding from heat of passion, a paroxysm of resentment, caused by adequate provocation. Malice is the impelling cause in murder; but it is not so in manslaughter, for in manslaughter there exists no malice. Murder proceeds from a wicked, depraved and malignant spirit, a heart regardless of social duty and perversely bent upon mischief. Voluntary manslaughter, on the contrary, is the unfortunate result of acts of unpremeditated and thoughtless violence, of acts of blind and unreflecting rage, caused by adequate provocation in which reason and choice for *Page 350 
the moment have no agency. But it is only to such acts as these, where there is no malice, that the law, in view of the infirmity of human nature, extends its benign and merciful consideration, so as to reduce the crime to manslaughter. Voluntary manslaughter, therefore, may be defined to be the unlawful killing of another in heat of blood, upon adequate or sufficient provocation and without malice, either express or implied. But in order to reduce the crime to manslaughter, where a dangerous or deadly weapon is used as the instrument by which death is caused, the provocation must be great indeed; so great, in fact, as to produce such a transport of passion and heat of blood, such an actual frenzy of the mind, as to render a man for the time being, utterly deaf to the voice of reason. If the act of killing is attended with circumstances showing preconceived malignity of heart, deliberation or formed design, it will not be manslaughter, but murder.
Provocation to avail anything, must be something which the slayer feels at the instant of its occurrence, and he must act under the sting of that provocation and resent it at once and without delay or time for thought or reflection. If between the provocation and the act of violence causing the death, there intervenes sufficient time for passion to subside, or the blood to cool, or time under the circumstances for the exercise of reflection and the formation of a deliberate purpose in regard to the act which he is about to do, provocation will not avail anything. For no provocation however great, will justify a man in killing another, nor will it excuse him. Killing on adequate or sufficient provocation must, at least, therefore, amount to manslaughter.
Now, gentlemen, I have endeavored to explain to you briefly, the characteristic and nature of malice in general, and also to point out to you the distinctive differences between express malice and malice implied by law from facts actually proved, and also to explain what under our statute law amounts to murder in the first and murder in the second degree. I have, moreover, stated to you the *Page 351 
rules or principles in regard to the crime of manslaughter, which is the lowest grade of felonious homicide. I have also endeavored to point out and explain to you by language as plain and significant as I can command, in what respect manslaughter differs from murder. Having thus, as I trust, enabled you to comprehend and understand these several matters, especially the legal meaning and import of the term malice, which enters so largely into the question of felonious homicide, as constituting the grand criterion distinguishing murder from manslaughter, I may, I think, without any impropriety and without in the least trenching upon the undoubted province of the jury, advert for the moment to material and undisputed facts disclosed by the testimony.
Gentlemen: — The terrible tragedy which resulted in the instant death of Charles Woolsey occurred on the early morning of Sunday, the 5th of the present month. The slayer and the slain had for several years antecedent to the fatal controversy, stood towards each other in the relation of mutual and intimate friends. They had often engaged in earnest disputation with each other, and at various times each of them for the moment became angry with the other, but it seems that this anger speedily passed off without, apparently, leaving any rancor in the heart of either. The material facts, as disclosed by the evidence, are but few in number and are easily stated. As to the origin or exciting cause of the controversy the testimony is silent. We know nothing definitely. We find the prisoner and Woolsey at the house of Mr. Caulk, at about 12 o'clock on Saturday night, in company with several friends. The prisoner and Woolsey prepared supper and set the table in the front room and their friends sat down and partook of the supper sometime between one and two o'clock on Sunday morning, the prisoner and Woolsey waiting on them at the table. It does not appear at what hour precisely these companions (except Cann) left the house. Cann says he laid clown on the lounge between half-past one and two o'clock and went to *Page 352 
sleep, and that when he laid down the mends were all there — when he awoke they were all gone. Up to this time there is no evidence of a quarrel between the prisoner and the deceased. Something certainly occurred and awoke Cann. When he awoke he saw Woolsey standing near his (Cann's) head as he lay on the lounge and Costen near to Woolsey within striking distance, and Gosten immediately moved down the room round the corner of the table — a portion or corner of the table being between them — and picking up a carving knife, he shook it at Woolsey and said to him "If you come at me again I will give you this," or "I will stick you with this." Woolsey replied, "I don't care a d___n for you or your knife," and advanced a step or two towards Costen, who immediately moved out of the room into the entry toward the door leading into the back room, Woolsey saying as he was so passing out of the room, "I have taken the d___d son of a bitch's abuse long enough," or "You d___d son of a bitch, I have taken your abuse long enough," for the witness states the remark both ways. At the time when Woolsey advanced towards Costen they were about four feet apart. Witness saw nothing in deceased's hands, and no attempt or offer to strike. Witness thinks that "between the time of Costen leaving the room and his hearing the report of the gun, he kind of lost himself a little;" but does not think it was for more than a minute. He says in another part of his evidence, "As near as I could come at it, about a minute elapsed between Costen's going out of the room and the report of the gun." At the time the gun was discharged, Woolsey was not moving — he was standing but a step or two from where Cann first saw him near his head. He was standing where he paused in his advance towards Costen. He was struck by the load discharged from the gun in the left breast and fell where he first stood and died almost instantly. Costen came forward to him immediately and requested Cann to catch the artery and stop the *Page 353 
flow of blood but it could not be done. Cann finding that he could not stop the flow of blood left the house, went and aroused the keeper of the hotel, and at the latter's suggestion, went after Dr." Hudders. It was probably from a quarter to half-past three o'clock when Woolsey was shot; for the Doctor says he was waked up by Cann at about a quarter to four o'clock, and proceeded immediately to Caulk's house, and upon examination of the body of Woolsey he found him already quite dead. At the time he (the Doctor) entered Caulk's house he passed Costen who was sitting on the door step, with his head leaning on his hands. As the Doctor was about to leave the house Costen told him that he was hurt, and that Woolsey had stabbed him in the back. He worked his way, the Doctor says, into the room, and the Doctor examined the condition of his back and found an incised wound just below the shoulder blade, and between that and the spinal column — in depth about one inch and three-quarters, and in width about three-quarters of an inch. The wound at the time he examined it was sonewhat swollen, and was, in his best judgment, an inch and a half in depth immediately after its infliction. Costen subsequently made a statement before the Coroner's jury, which was reduced to writing, and is now before you as a part of the evidence.
Whether his statement, assuming it to be true, indicates thought and deliberation, is a question for your decision under the circumstances of the case. It is manifest, however, I think, that but a short time elapsed between the prisoner's leaving the room and the report of the gun. Cann thinks it was about a minute. It may have been more — it may have been less. But whether the time was shorter or longer, if you shall be satisfied from the evidence that the prisoner in that short space of time deliberately formed the design, purpose or intent to kill the deceased, and in execution of such deliberation, purpose and intent shot him to death, his crime will amount to murder with express malice, and hence to murder in the first degree. If, however, you shall not be fully satisfied from the evidence that he intended to kill the deceased, but that *Page 354 
at the time he fired the fatal shot there was a deliberately formed purpose and design to disable the deceased by shooting off his arm, his crime will amount to murder in the second degree; for such an act would be an unlawful, cruel act — an act without either justification or excuse — from which the law implied malice and which constitutes the test or criterion of murder in the second degree.
But, gentlemen, if you shall be satisfied from the evidence that at the time or immediately preceding the waking up of the witness, Cann, there was or had been a collision or contest between the prisoner and the deceased, and that the deceased then and there stabbed the prisoner in the back and inflicted the wound spoken of by Dr. Hudders and Wm. T. Cann, then, I say to you, that such stabbing was a provocation, indeed a great provocation, and if the prisoner acted immediately and without delay under the sting of that provocation induced by a sudden transport of passion and in a moment of frenzy or heat of blood caused by that provocation, and without deliberation or formed design, suddenly rushed from the room and seizing the gun discharged its contents against the body of the deceased, his crime will be reduced to manslaughter; for from such a sudden act, done in the heat of blood upon reasonable or adequate provocation and without deliberation, the law does not imply malice, but attributes the act to the infirmity of human nature. A few more words, gentlemen, in regard to the law of this case, and I shall close what I deem it to be my duty to say to you on the present occasion. 1st. I repeat to you that whenever there is a design or intention deliberately formed in the mind to take life, and death ensue, it is murder with express malice and therefore murder in the first degree. 2d. When there exists no design or intention to take life, but death results from an unlawful act of violence on the part of the slayer, and in the absence of adequate provocation, it is murder with implied malice and therefore murder in the second degree. 3d. Voluntary manslaughter is the *Page 355 
unlawful killing of another in heat of blood upon sufficient or adequate provocation and without malice. But no provocation, however just, will justify the killing of another, nor will it excuse the act. Killing upon provocation cannot be less than manslaughter.
 Verdict — Guilty of manslaughter.